Jose DeCastro
5350 Wilshire Blvd, PO Box 36143
Los Angeles, CA 90036
chille@situationcreator.com
Plaintiff in Pro Se

FILED _____   _____ RECEIVED
ENTERED _____   _____ SERVED ON
COUNSEL/PARTIES OF RECORD

JUL 10 2026

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEP

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

JOSE DECASTRO,
        Plaintiff,

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT; CLARK COUNTY,
NEVADA; OFFICER REITHOLT, first
name unknown, in his individual capacity;
and DOE OFFICERS 1 through 20, inclusive,

        Defendants.

2:26-cv-02095-CDS-MDC

Case No. _____

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. SECTION 1983

JURY TRIAL DEMANDED

Plaintiff Jose DeCastro, appearing in pro se, alleges as follows:

I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. Section 1983 arising from Plaintiff's

incarceration at the Clark County Detention Center ("CCDC") in Las Vegas, Nevada, from on or

about March 17, 2024 through July 11, 2024, following convictions that were subsequently

reversed on appeal on First Amendment grounds.

2. During that incarceration, Defendants retaliated against Plaintiff for exercising his First

Amendment rights as a journalist, denied him religious materials and basic reading and writing

materials, subjected him to cruel and unusual conditions of confinement including twenty-three hour per day lockdown with food served on the floor, acted with deliberate indifference to his serious medical needs by confining him to his bed for extended periods under threat of return to disciplinary segregation despite dangerously high blood pressure, and unlawfully detained him for approximately twenty-four hours after a court reversed his convictions in open court and ordered his release.

3. Plaintiff files this complaint to preserve his claims within the applicable limitations period and gives notice that he will amend this complaint to add specificity, documentation, and additional defendants as their identities become known through public records requests and discovery.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. Sections 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. Section 1983.

5. Venue is proper in the District of Nevada under 28 U.S.C. Section 1391(b) because all Defendants reside in this District and all of the events giving rise to the claims occurred in Clark County, Nevada.

## III. PARTIES

6. Plaintiff Jose DeCastro is an individual and a citizen of the United States. Plaintiff is a nationally known independent journalist, First Amendment auditor, and constitutional educator whose reporting on law enforcement reaches an audience of hundreds of thousands of subscribers through his Delete Lawz platform on YouTube and Instagram. At all relevant times Plaintiff was incarcerated at CCDC.

2

7. Defendant Las Vegas Metropolitan Police Department ("LVMPD") is a political subdivision of the State of Nevada that owns, operates, staffs, and sets policy for CCDC. LVMPD is sued as a municipal entity under Monell v. Department of Social Services, 436 U.S. 658 (1978).

8. Defendant Clark County, Nevada is a political subdivision of the State of Nevada that funds and shares responsibility for CCDC and its policies and practices. Clark County is sued as a municipal entity under Monell.

9. Defendant Officer Reitholt, first name unknown and surname spelled as best known to Plaintiff and subject to correction through discovery, is a corrections officer employed at CCDC. He is sued in his individual capacity. At all relevant times he acted under color of state law.

10. Defendants Doe Officers 1 through 20 are corrections officers, supervisors, medical staff, intake staff, and other employees or agents of LVMPD or Clark County whose true names are unknown to Plaintiff. They include the officers who placed Plaintiff in disciplinary segregation, the disciplinary hearing officer described below, the officer who threatened Plaintiff during the strip search described below, the officers and supervisors involved in the death in custody described below, the intake staff described below, and the staff responsible for Plaintiff's over detention. Each acted under color of state law. Plaintiff will amend to state their true names when ascertained.

## IV. FACTUAL ALLEGATIONS

A. The Underlying Convictions and Their Reversal on First Amendment Grounds

11. Plaintiff was convicted in the Las Vegas Municipal Court, Judge Zimmerman presiding, of misdemeanor obstruction and resisting arising from Plaintiff's filming of a traffic stop as a member of the press. Although the prosecution requested concurrent suspended

sentences of ninety days, the trial court imposed the maximum consecutive sentences, and Plaintiff was taken into custody at CCDC on or about March 17, 2024.

12. Plaintiff appealed. On or about July 10 or 11, 2024, following full briefing and oral argument by appellate counsel Christopher Oram, the appellate court granted the appeal and reversed both convictions in open court on the ground that Plaintiff's conduct was protected by the First Amendment, and stated on the record that Plaintiff needed to be released from custody. The case number and written order will be supplied by amendment.

B. Retaliation for Protected Press Activity: Disciplinary Segregation for Streaming a Telephone Call

13. While incarcerated, Plaintiff placed a telephone call to another journalist, who streamed the call live. Speaking to the press and to the public about his incarceration was protected First Amendment activity, and it was the same category of protected activity for which the appellate court later held Plaintiff had been wrongfully convicted.

14. In response, CCDC staff placed Plaintiff for seven days in the disciplinary segregation unit, referred to by staff and inmates as the hole, under lockdown of approximately twenty-three hours per day. Staff claimed Plaintiff had violated a rule prohibiting streaming a phone call. No such rule exists in the CCDC inmate handbook. The handbook refers only to vague "phone misuse" and does not state that an inmate cannot stream a phone call or speak to the press.

15. The disciplinary charge lodged against Plaintiff was phone misuse. Plaintiff received no advance written notice of the charge before being punished. Plaintiff was placed in disciplinary segregation first, and only afterward, approximately two days later, though Plaintiff

4

lost track of time in segregation, was he brought to a room with a video interface for a disciplinary hearing.

16. A Doe hearing officer appeared on the video screen. Visible directly behind her throughout the hearing was a large American flag with a blue stripe across it, a thin blue line banner expressing solidarity with law enforcement, as she adjudicated whether Plaintiff, a journalist known for his criticism of law enforcement, would be punished for his communication with the press.

17. The hearing documents stated that Plaintiff had the right to call witnesses. When Plaintiff stated that he had a witness, the hearing officer told him no, that there was no witness process happening. She gave no institutional safety justification or any other reason for refusing.

18. The hearing officer upheld the punishment of seven days in disciplinary segregation, a punishment Plaintiff was already serving. Plaintiff received no written statement of the evidence relied on or the reasons for the punishment. At the conclusion of the hearing the officer told Plaintiff, in a dismissive tone, "Mr. DeCastro, I'm sure you're gonna have a better day. I'm sure I'm not gonna see you in here again."

19. Punishing Plaintiff with disciplinary segregation under a rule that does not exist was arbitrary, was without legitimate penological justification, and was retaliation for Plaintiff's protected speech and press activity, undertaken because of Plaintiff's identity as a prominent critic of law enforcement. The presence of the banner is alleged as one of the circumstances surrounding the disciplinary hearing.

20. Upon Plaintiff's arrival at the disciplinary segregation unit, Doe Officers subjected Plaintiff to a strip search. Before the search began, one of the guards leaned over and whispered a threat into Plaintiff's ear, telling Plaintiff that he would be required to take off his pants, spread

5

his buttocks, and cough, and that if Plaintiff in any way, shape, or form turned to face the guard, the guard would consider it an act of violence and would hurt Plaintiff badly.

21. The threat was not a security instruction. It was whispered so that it would not be overheard, it was delivered while Plaintiff was in the most vulnerable and humiliating posture the facility could impose, and it was calculated to terrorize and degrade Plaintiff as part of the retaliatory punishment for his protected press activity. The threat caused Plaintiff fear, humiliation, and lasting emotional harm.

C. Conditions in Disciplinary Segregation

22. While in disciplinary segregation, Plaintiff was confined to his cell approximately twenty-three hours per day, with only about one hour per day outside the cell. His food was placed on the floor of the cell, which was disgusting and unsanitary.

23. Although the cell was designed for two occupants, Plaintiff rarely had a cellmate. Most inmates assigned to the cell were transferred within approximately twelve to twenty-four hours, leaving Plaintiff effectively isolated for nearly the entire period of his disciplinary confinement.

24. The practical effect of these conditions was near total isolation. Plaintiff had almost no human interaction because cellmates changed so frequently, almost no opportunity for exercise, and, as alleged below, no books, no writing materials, and no Bible. Each of these deprivations compounded the psychological effects of the others.

25. While in disciplinary segregation and throughout his incarceration, Plaintiff was denied a Bible despite requesting one, in violation of his right to religious exercise. He was also denied a pencil, paper, books, and any reading material, despite CCDC's own policies providing

6

for such materials, leaving him in conditions of enforced sensory and intellectual deprivation and cutting off his ability to prepare legal materials and communicate in writing.

26. Several guards told Plaintiff that CCDC had suspended providing books, Bibles, pencils, and paper to all inmates in disciplinary segregation because other inmates had previously ruined books and gotten them wet. This was an admission by CCDC staff of a blanket practice of denying religious and reading materials to every inmate in the unit, contrary to CCDC's own written policies, punishing Plaintiff for the past conduct of others with no individualized justification.

D. Deliberate Indifference to Serious Medical Needs: The Reitholt Bed Confinement Incidents

27. Plaintiff had suffered from high blood pressure for approximately one year before his incarceration and suffered from severe hypertension during his incarceration, with systolic blood pressure readings repeatedly exceeding approximately two hundred ten to two hundred twenty and diastolic readings of approximately one hundred sixty, dangerously elevated levels that CCDC medical staff documented and monitored. Plaintiff was not receiving medication, and physical movement, standing, and walking were medically necessary to manage his condition. A CCDC nurse documented Plaintiff's blood pressure and informed Plaintiff of his condition and of his need for movement.

28. Defendant Reitholt ordered Plaintiff confined to his bed for twenty-four hours as punishment for standing up and getting a book, directing that Plaintiff remain seated on his bed and not get up except to use the bathroom or to go to chow, and that if Plaintiff otherwise got up he would be sent back to disciplinary segregation. When Plaintiff asked why, Reitholt extended the confinement to forty-eight hours.

29. Plaintiff told Reitholt directly that he needed to move his body because of his extraordinarily high blood pressure, that he had been dealing with high blood pressure for the past year, that movement was the remedy for his condition, and that the CCDC nurse had told Plaintiff he had high blood pressure and needed movement for a medical reason. Reitholt nonetheless enforced the bed confinement, denied him physical activity, and told Plaintiff that if he did not sit back down on his bed he would be placed back in the hole.

30. During the enforced bed confinement, Plaintiff could feel the pressure of his blood pushing behind his eyes as he sat unable to move. When other inmates received free time, Plaintiff attempted to stand and move his knees and body to manage his blood pressure. Reitholt threatened him with return to disciplinary segregation for doing so. Reitholt acted with knowledge of and reckless disregard for a substantial risk of serious harm to Plaintiff's health, including risk of stroke, heart attack, and death.

E. Unsafe Shaving Conditions

31. CCDC required Plaintiff to shave using a dull steel plate rather than a mirror. The plate was so degraded that Plaintiff could not see his own face in it. As a result, Plaintiff cut his face repeatedly, suffering cuts, nicks, and gouges. When Plaintiff objected, a guard told him his only alternative was not to shave at all. Forcing Plaintiff to choose between repeated facial injury and abandoning basic grooming, with knowledge that the equipment caused injury, was deliberately indifferent to Plaintiff's safety and dignity.

F. Intake Conditions

32. Upon booking, Plaintiff was forced through an intake process in which he was made to sit upright in a crowded room for more than twenty-four hours with no place to lie down. The

8

conditions were disgusting and unsanitary. These conditions were the product of CCDC policy or custom applied to all arriving detainees.

## G. Death in Custody Witnessed by Plaintiff

33. During the final week of March 2024, approximately one to two weeks after Plaintiff entered CCDC, on or about March 25 through March 28, 2024, while Plaintiff was held in the disciplinary segregation unit, Plaintiff witnessed CCDC staff kill a man housed in the segregation cell near Plaintiff's. Plaintiff was alone in a cell approximately five feet by eight feet containing two wooden beds, and he witnessed the incident through the viewing slot in his cell door, an opening approximately four inches wide and eighteen inches tall. The segregation unit was two tiers high and was filthy and unsanitary.

34. The man, who appeared healthy, wanted to go home and was beating on the door of his cell. CCDC deployed a platoon of officers who removed him from the cell and placed him in a restraint chair. Based upon Plaintiff's personal observations, with the man already strapped into the restraint chair and fully controlled, multiple officers then placed their body weight on top of him, after which the man stopped responding and died. Plaintiff watched the entire incident.

35. Correctional Officer Palmer was also present in the unit during the incident, positioned toward the back of the unit on the upper tier, where Plaintiff saw him. After Plaintiff was released from disciplinary segregation into a barracks housing approximately seventy men, Palmer came into the barracks, remembered seeing Plaintiff in the segregation unit, and remarked that Plaintiff looked much better now that he was out of the hole. When Plaintiff asked Palmer what had happened to the man, Palmer told Plaintiff that the man had died of excited delirium.

36. Plaintiff disputes that characterization. Based on what Plaintiff personally observed, the man was already secured in the restraint chair before multiple officers placed their body weight on top of him.

37. Plaintiff is a direct eyewitness to this death in custody. Shortly after witnessing the killing, Plaintiff was transported to court, and he experienced overwhelming fear that he would be returned to the same housing unit where he had just watched a man lose his life at the hands of the officers who controlled every aspect of Plaintiff's own daily existence.

38. Plaintiff does not seek in this action to litigate the death itself on behalf of the decedent. Witnessing the killing, and living afterward in fear of the same officers in the same facility, caused Plaintiff intense and continuing emotional distress, fear, anxiety, and symptoms consistent with post-traumatic stress that have persisted after his release. The incident also provides factual support for Plaintiff's allegations regarding the policies, practices, and customs at CCDC. Clark County and LVMPD are required to keep records of all deaths in custody, and such records are discoverable.

39. During Plaintiff's incarceration, several inmates warned Plaintiff not to complain about correctional staff, telling him that inmates who filed complaints could expect their lives to become very rough. Having already been threatened during a strip search, placed in disciplinary segregation, and witnessed the death of another inmate in that same housing unit, Plaintiff reasonably feared further retaliation while he remained incarcerated.

H. Over Detention After Reversal and Ordered Release

40. When the appellate court reversed both convictions in open court and stated that Plaintiff needed to be released, CCDC refused to release Plaintiff. CCDC staff claimed that only

the obstruction conviction had been overturned and that the resisting conviction still stood. That claim was false. The court reversed the convictions, plural, on the record.

41. CCDC held Plaintiff for approximately twenty-four additional hours after his legal entitlement to release. Plaintiff was released on July 11, 2024 only after a fellow journalist telephoned the clerk's office, the clerk contacted the judge, and the judge issued a written order directing Plaintiff's release. But for that outside intervention, CCDC would have continued to detain Plaintiff without legal authority.

I. Continuing Course of Conduct

42. Throughout Plaintiff's incarceration, Defendants repeatedly used retaliation, isolation, humiliation, denial of religious and educational materials, deliberate indifference to serious medical needs, threats of violence, and unlawful detention against Plaintiff. These actions were not isolated mistakes. They reflected an ongoing pattern of unconstitutional treatment that culminated in Plaintiff's unlawful continued confinement after his convictions had been reversed.

43. The constitutional violations described in this Complaint were not isolated incidents. They were part of a continuous and uninterrupted course of conduct occurring throughout Plaintiff's incarceration at CCDC. The retaliation, disciplinary segregation, denial of religious and reading materials, deliberate indifference to serious medical needs, threats of violence, inhumane conditions of confinement, and unlawful over detention occurred during one continuous period of custody that began on or about March 17, 2024 and did not end until Plaintiff's release on July 11, 2024. These events are properly viewed as part of a single continuing course of unconstitutional conduct arising from Plaintiff's incarceration.

44. The various constitutional violations alleged herein were not independent or unrelated events. Each occurred while Plaintiff remained continuously incarcerated under the control of the same institution and arose out of the same period of confinement, during which Defendants repeatedly subjected Plaintiff to unconstitutional treatment.

45. Plaintiff alleges that the constitutional violations described herein arose from one continuous course of conduct that remained ongoing until his release from custody on July 11, 2024. Plaintiff therefore invokes the continuing violation doctrine and any other applicable tolling doctrines to the extent permitted by law.

46. Plaintiff intends to identify the disciplinary hearing officer, the guards who admitted the blanket practice regarding books and Bibles, the officer who threatened Plaintiff during the strip search, the officers involved in the death in custody, and the personnel responsible for Plaintiff's delayed release, through disciplinary records, housing logs, shift rosters, grievance records, public records requests, and discovery. The names exist and the records exist, and Plaintiff will amend this complaint to state them.

J. Injuries and Damages

47. As a direct and proximate result of Defendants' conduct, Plaintiff suffered physical injury, including cuts to his face and the physical effects of prolonged immobilization during a period of dangerously elevated blood pressure; deprivation of liberty, including approximately twenty-four hours of detention without any legal authority; and severe emotional and psychological injury, including trauma, fear, anxiety, humiliation, degradation, and lingering emotional distress with continuing symptoms consistent with post-traumatic stress.

48. Plaintiff's continuing symptoms include nightmares and bad dreams, waking in cold sweats, recurring and intrusive thoughts and imagery of the death he witnessed, including

nightmares in which the officers killed the man and then killed Plaintiff, anxiety triggered by the sight of correctional officers, and fear associated with confinement. While Plaintiff remained in custody after witnessing the killing, including while sitting in court, Plaintiff experienced fear that he would be taken back and killed next by the same officers. These injuries have persisted after Plaintiff's release and continue to affect him.

## V. CLAIMS FOR RELIEF

### COUNT I

First Amendment Retaliation, 42 U.S.C. Section 1983

Against Doe Officers and Monell Defendants

49. Plaintiff realleges all preceding paragraphs.

50. Plaintiff engaged in protected First Amendment activity, including speaking to a journalist by telephone about matters of public concern, namely his incarceration following convictions later held unconstitutional.

51. Defendants took adverse action against Plaintiff, placing him in disciplinary segregation under twenty-three hour per day lockdown for seven days under a rule that does not exist, an action that would chill a person of ordinary firmness from continuing to engage in protected activity.

52. Plaintiff's protected activity was a substantial or motivating factor for the adverse action, and the action lacked any legitimate penological justification.

### COUNT II

First Amendment Free Exercise and Denial of Reading and Writing Materials, 42 U.S.C. Section

1983

Against Doe Officers and Monell Defendants

53. Plaintiff realleges all preceding paragraphs.

54. Defendants denied Plaintiff a Bible despite his requests, substantially burdening his religious exercise without any legitimate penological justification.

55. Defendants denied Plaintiff books, reading materials, pencil, and paper, in violation of the First Amendment and contrary to CCDC's own stated policies.

## COUNT III

Eighth Amendment Cruel and Unusual Punishment, Conditions of Confinement, 42 U.S.C.

Section 1983

Against Doe Officers and Monell Defendants

56. Plaintiff realleges all preceding paragraphs.

57. The conditions described above, including twenty-three hour per day lockdown, food served on the floor, denial of all reading and writing materials, unsanitary intake conditions requiring Plaintiff to sit upright for more than twenty-four hours, and forced use of injurious shaving equipment, individually and in combination deprived Plaintiff of the minimal civilized measure of life's necessities.

58. Defendants knew of and disregarded the excessive risks to Plaintiff's health and safety posed by these conditions.

## COUNT IV

Eighth Amendment Deliberate Indifference to Serious Medical Needs and Punitive Restriction of

Movement, 42 U.S.C. Section 1983

Against Defendant Reitholt and Monell Defendants

59. Plaintiff realleges all preceding paragraphs.

14

60. Plaintiff's hypertensive crisis was an objectively serious medical need, documented by CCDC medical staff.

61. Defendant Reitholt knew of that need because Plaintiff told him directly of his year long history of high blood pressure, of his current condition, and of the nurse's statement to Plaintiff that movement was medically necessary. Reitholt nonetheless ordered Plaintiff to remain seated on his bed for twenty-four and then forty-eight hours with no exceptions other than the bathroom and chow, denied him physical activity, and threatened him with return to disciplinary segregation if he stood up to move his body, in reckless disregard of a substantial risk of serious harm including stroke and death.

## COUNT V

Fourteenth Amendment Due Process, Punishment Under a Nonexistent Rule, 42 U.S.C. Section

1983

Against Doe Officers and Monell Defendants

62. Plaintiff realleges all preceding paragraphs.

63. Defendants imposed punitive disciplinary segregation on Plaintiff for violating a rule that does not exist in the CCDC handbook, without fair notice and without any legitimate disciplinary basis, in violation of due process.

64. Defendants further denied Plaintiff the procedural protections required by Wolff v. McDonnell, 418 U.S. 539 (1974), before punishing him with disciplinary segregation. Plaintiff received no advance written notice of the charge. The punishment was imposed before any hearing occurred, and the hearing served only to ratify a punishment Plaintiff was already serving. Plaintiff was denied the right to call a witness despite the hearing documents stating that he had that right, with no institutional justification offered. Plaintiff received no written

15

statement of the evidence relied on or the reasons for the punishment. The circumstances alleged above, including the summary refusal of Plaintiff's witness, the ratification of a punishment already imposed, and the banner displayed behind the hearing officer, deprived Plaintiff of the impartial decision maker and fair process to which he was entitled.

## COUNT VI

Fourteenth Amendment Due Process, Over Detention After Ordered Release, 42 U.S.C. Section 1983

Against Doe Officers and Monell Defendants

65. Plaintiff realleges all preceding paragraphs.

66. Once the appellate court reversed Plaintiff's convictions and ordered his release, Plaintiff had a clearly established liberty interest in release from custody. Defendants detained Plaintiff for approximately twenty-four additional hours based on a false assertion that one conviction remained, releasing him only after a judge issued a written order procured by outside intervention.

67. Defendants' over detention of Plaintiff resulted from deliberate indifference and from LVMPD and Clark County policies, customs, or failures of training and procedure governing timely release, consistent with Oviatt v. Pearce, 954 F.2d 1470 (9th Cir. 1992), and Berry v. Baca, 379 F.3d 764 (9th Cir. 2004).

## COUNT VII

Monell Liability, 42 U.S.C. Section 1983

Against LVMPD and Clark County

68. Plaintiff realleges all preceding paragraphs.

69. The constitutional violations alleged above were caused by the policies, customs, and practices of LVMPD and Clark County, including: punishing detainees under vague or nonexistent rules; use of punitive disciplinary segregation with twenty-three hour per day lockdown and food served on the floor; a blanket practice, admitted by CCDC staff, of denying religious, reading, and writing materials to all inmates in disciplinary segregation; inadequate medical care and the use of prolonged restraint against medical advice; unsanitary and inhumane intake practices; a pattern of excessive force, intimidation, and abusive treatment of detainees, evidenced by the threat made to Plaintiff during the strip search and the death in custody witnessed by Plaintiff in late March 2024 and its characterization as excited delirium; and inadequate policies, training, and procedures for the timely release of detainees whose convictions have been reversed.

70. These policies, customs, and practices, and the failure to train and supervise CCDC staff, amounted to deliberate indifference to the constitutional rights of persons in custody and were the moving force behind the violations of Plaintiff's rights.

## COUNT VIII

Eighth Amendment Abusive Strip Search and Threat of Violence, and First Amendment

Retaliation, 42 U.S.C. Section 1983

Against Doe Officers and Monell Defendants

71. Plaintiff realleges all preceding paragraphs.

72. During the strip search conducted upon Plaintiff's retaliatory placement in disciplinary segregation, a Doe Officer whispered a threat of serious violence to Plaintiff, telling him that any turn toward the officer while Plaintiff was undressed and exposed would be treated as an act of violence and met with the officer hurting Plaintiff badly.

17

73. The threat was made maliciously and sadistically to terrorize, humiliate, and degrade Plaintiff during a search that was itself part of a punishment imposed under a nonexistent rule in retaliation for protected press activity. The threat served no legitimate penological purpose, constituted adverse action that would chill a person of ordinary firmness from exercising First Amendment rights, and inflicted psychological harm on Plaintiff.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor on all claims;

B. Award compensatory damages in an amount to be proven at trial, including damages for physical injury, pain and suffering, emotional distress, and post-traumatic stress;

C. Award punitive damages against the individual defendants;

D. Award nominal damages;

E. Award costs of suit, and reasonable attorney fees under 42 U.S.C. Section 1988 should Plaintiff retain counsel;

F. Grant such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 10, 2026

Respectfully submitted,

_____

Jose DeCastro

Plaintiff in Pro Se

18